[No. 3794. Decided March 14, 1901.]

GEORGE BIRD, *Appellant*, v. HENRY WINYER *et al., Respondents.*

JURISDICTION OF STATE COURTS — QUESTIONS INVOLVING TITLE TO PUBLIC LANDS.

The superior court of this state has jurisdiction, in the absence of any statutory enactment to the contrary, to determine questions between Indians regarding Indian lands within the state, which have been allotted under the treaties and statutes of the United States.

QUIETING TITLE — RIGHT OF OCCUPANT TO MAINTAIN ACTION.

Any person in possession of land, although not the owner of the fee, may maintain an action for the purpose of quieting his title thereto, so as to avoid any uncertainty in his holding, under Bal. Code, § 5521, which provides that any person in possession of real property may maintain a civil action against any person claiming an interest in said real property, or any right thereto, adverse to him, for the purpose of determining such claim, estate or interest.

PUBLIC LANDS — ALLOTMENT TO INDIANS — NATURE OF TITLE — RIGHT
OF INHERITANCE.

Under the sixth article of the treaty of 1854 with the Nisqually
and other tribes (10 U. S. St. at Large, 1044), which provides that
the president may assign to each Indian family of two, one quar-
ter section of land, to each family of three and not exceeding
five, one half section, and to larger families, more in proportion,
if such Indians will locate on the same as a permanent home;
may issue patent therefor conditioned against power of alienat-
ing the lands; and may cancel the assignment in case such family
neglect to occupy and till a portion of the assigned lands, nothing
passes by patent except the right of possession and occupancy of
the lands described, but the absolute fee remains in the govern-
ment, and hence, upon the death of tne wife, no rights would pass
by inheritance to the children of the wife by a former marriage,
where an assignment of a quarter section had been made to her
husband as the head of a family composed of himself and wife,
and the land granted to him as the head of said family and to his
heirs.

Appeal from Superior Court, Pierce County.—Hon.
JAMES A. WILLIAMSON, Judge. Reversed.

*George T. Reid (James Wickersham* and *Reid & Meade,*
of counsel), for appellant.

*Samuel F. McAnally,* for respondents.

The opinion of the court was delivered by

MOUNT, J.—The plaintiff brings suit against the de-
fendants to remove a cloud from title to certain real estate,
and alleges substantially as follows: That he was born
of Indian parents, a member of the tribe of Puyallup In-
dians, on the Puyallup Indian reservation, in the state
of Washington. That under the terms of the treaty of De-
cember 26, 1854, between the United States and the said
Puyallup Indians, he was entitled to have, and there was
allotted, assigned, and patented to him in severalty, forty
acres of land on said reservation, as follows: the north-
east quarter of the southwest quarter of section 12, town-

ship 20 north, range 3 east, W. M. That on January 17, 1881, with his wife, Mary Bird, an Indian woman, also a member of said tribe, he accepted said allotment, located upon, improved, and occupied the same continuously thereafter, and is now in possession thereof, occupying the same as a permanent home. That on January 30, 1886, a patent issued to him, as follows:

"The United States of America, to all to whom these presents shall come, Greeting:

"Whereas, by the sixth article of the treaty concluded on the twenty-sixth day of December, Anno Domini one thousand eight hundred and fifty-four, between Isaac I. Stevens, governor and superintendent of Indian affairs of Washington Territory, on the part of the United States, and the chiefs, headmen and delegates of the Nisqually, Puyallup, Steilacoom, Squawskin, S'Homamish, Stehchass, T'Peeksin, Squiaitl, and Sa-heh-wamish tribes and bands of Indians, it is provided that the president, 'at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable;'

"And Whereas, there has been deposited in the General Land Office of the United States an order bearing date January 20th, 1886, from the Secretary of the Interior, accompanied by a return dated October 30th, 1884, from the office of Indian Affairs, with a list approved October 23rd, 1884, by the president of the United States, showing the names of members of the Puyallup band of Indians who have made selections of land in accordance with the provisions of the said treaties, in which list the following tracts of land have been designated as the selection of Teoaway or George Bird, the head of a family consisting of himself and Mary, viz: the southwest quarter of the northwest quarter of section fifteen (40.00 acres), the south-

east quarter of the northeast quarter and the northeast quarter of the southeast quarter of section sixteen (80.00 acres), in township twenty-one north, and the northeast quarter of the southwest quarter of section twelve (40.00 acres), in township twenty north, of range three east of the Willamette Meridian, Washington Territory, containing in the aggregate one hundred and sixty acres;

"Now know ye, that the United States of America, in consideration of the premises, and in accordance with the directions of the president of the United States, under the aforesaid sixth article of the treaty of the sixteenth day of March, Anno Domini one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted, and by these presents does give and grant, unto the said Teo-away, or George Bird, as the head of the family as aforesaid, and to his heirs, the tracts of land above described, but with the stipulation contained in the said sixth article of the treaty with the Omaha Indians, that the said tracts shall not be alienated or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution embracing such lands within its boundaries shall have been formed, and the legislature of the state shall remove the restrictions; and no state legislature shall remove the restrictions without the consent of Congress.

"To have and to hold the said tracts of land, with the appurtenances, unto the said Teo-away, or George Bird, as the head of the family as aforesaid, and to his heirs forever, with the stipulation aforesaid.

"In testimony whereof I, Grover Cleveland, President of the United States, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

"Given under my hand, at the city of Washington, this thirtieth day of January, in the year of our Lord one thousand eight hundred and eighty-six, and of the independence of the United States the one hundred and tenth.

By the president:        Grover Cleveland.
By M. McKean, Secretary.
S. W. Clark, Recorder of the General Land Office."

That plaintiff and Mary Bird had no children of their own, but Mary Bird had two children by a former husband. That these two children did not live with plaintiff and Mary, and were not a part of the family. That about August 15, 1887, Mary died intestate, and defendants thereupon set up a claim to an undivided one-half interest in said lands, which claim is without any right, operates as a cloud upon plaintiff's title and the rents and profits of said premises, and causes plaintiff irreparable injury. That both plaintiff and defendants are citizens of the United States and residents of the state of Washington. A demurrer was filed by the defendants to the complaint on the grounds that the court had no jurisdiction, and that the said complaint did not state a cause of action. This demurrer being overruled, and exception taken, defendants thereupon filed their answer admitting all the allegations of the complaint, and alleged in substance as follows: That the title to said lands remains in the government of the United States, and that this cause cannot be heard and determined without making the United States government a party to the suit; and, second, that a commission was appointed by the United States, whose duty it was to ascertain and determine the true owners of said land, and that said commission did thereafter ascertain and determine the ownership thereof, and found that the defendants were the owners of an undivided one-half thereof, and that the same was duly reported to the secretary of the interior, and that the said findings and determinations were duly approved by said secretary and are conclusive and binding upon the plaintiff in this action; and third, that when the patent aforesaid was issued to said George Bird it was issued under the provisions of the treaty before

18-24 WASH.

set out, and was for the benefit of the said family, and that Mary Bird, his wife, by said patent, took an equal interest in and to the said land with the plaintiff. That defendants are heirs at law of said Mary Bird, and that upon the death of said Mary Bird, as aforesaid, the defendants herein became and are entitled to the said undivided one-half thereof. A demurrer by the plaintiff to the first two causes of defense above set out was sustained by the court, but as to the third was overruled, the said demurrer being to each of the said causes, for the reason that the facts stated did not constitute a defense. The plaintiff electing to stand upon his demurrer to the answer, the court made an order dismissing the said action. Plaintiff appeals from the said order of dismissal, and the defendants appeal from that part of the order sustaining the demurrer to the first and second answers, and also from the order of the court overruling the demurrer to the complaint.

The section of the treaty referred to is found in 10 U. S. St. at Large, 1044, and is as follows:

"The president may, from time to time, at his discretion, cause the whole or such portion of the land hereby reserved, as he may think proper, or of such other land as may be selected in lieu thereof, as provided for in article first, to be surveyed into lots, and to assign to such Indian or Indians [Indian or families] of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter section; to each family of three and not exceeding five, one-half section; and to each family of six and not exceeding ten, one section; and to each family over ten in number, one-quarter section for every additional five members. And he may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoy-

ment of such permanent home and the improvements thereon. And the president may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force, until a state constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the state shall remove the restrictions. And if any such person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned and on which they have located, or shall rove from place to place, the president may, if the patent shall have been issued, cancel the assignment, and may also withhold from such person or family, their proportion of the annuities or other moneys due them, until they shall have returned to such permanent home, and resumed the pursuits of industry; and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land. And the residue of the land hereby reserved, or of that which may be selected in lieu thereof, after all of the Indian persons or families shall have had assigned to them permanent homes, may be sold for their benefit, under such laws, rules or regulations as may hereafter be prescribed by the Congress or president of the United States. No state legislature shall remove the restrictions herein provided for, without the consent of Congress."

Three questions are presented to this court upon this appeal, as follows: (1) Have state courts jurisdiction of the parties and the subject matter? (2) Does the complaint state a cause of action? (3) Did Mary Bird at the time of her death have any interest in the lands in question which could descend to her heirs by a former husband? Upon the question of jurisdiction of state courts

to determine adverse claims of parties as in this case, no
authorities are cited to the effect that the state courts have
not jurisdiction.   Since the courts of the state are courts
of general jurisdiction, we assume that, unless want of
jurisdiction is shown to exist under positive law. it rests
in the state courts.   17 Am. & Eng. Enc. Law (2d ed.),
p. 1073; 24 U. S. St. at Large, p. 390, § 6;; *Wa-la-note-
tke-tynin* v. *Carter* (Idaho), 53 Pac. 106; *Swartzel v.
Rogers,* 3 Kan. 374; *Felix v. Patrick,* 145 U. S. 332 (12
Sup. Ct. 862).

These authorities seem to us to be in point to the ef-
fect that the state courts have jurisdiction to determine
questions between Indians regarding Indian lands within
the state.

2.   Section 5521, Bal. Code, omitting the parenthetical
expressions thereof, is as follows:

"Any person in possession  .  .  .  of real prop-
erty  .  .  .  may maintain a civil action against any
person or persons  .  .  .  claiming an interest in
said real property or any part thereof or any right there-
to, adverse to him,  .  .  .  for the purpose of deter-
mining such claim, estate or interest;" etc.

This section it would seem needs no argument in sup-
port of its construction.   There is no requirement here
that the plaintiff must have or claim to have title, as in
some other states.   Under the common-law action to re-
move cloud the plaintiff must be in possession.   He must
have been disturbed in his possession, and he must have
established his right by successive judgments in his favor.
Adams, Equity, p. 202; Pomeroy, Equity Jurisprudence,
§ 248; Bispham, Equity (5th ed.), § 568.

The section above quoted, for obvious reasons, has done
away with the provisions of the common law, and also,
in common with statutes in other states. in the Union, has
obviated the necessity of alleging and proving title.   Any

person in possession may maintain the action for the
purpose of quieting his own or his adversary's claim there-
to so as to avoid any uncertainty in his holding.    It is
said, in *McDonald v. Early,* 15 Neb. 63, where the ac-
tion arose under a lease of school lands from the state:

"A leasehold estate, running for twenty-five years in
a valuable piece of property, may be of vastly greater
value than a fee simple title to another piece.    Besides,
as we have already seen, the remedy at common law is not
confined to real property at all and the statute is an en-
larging rather than a restricting one.    A vast amount of
valuable lands belonging to one of the most sacred trust
funds of the state, is now held by citizens under leases
like the one copied in the petition in the case at bar.    The
method of obtaining these leases, as well as the pay-
ments and other duties necessary to keep them alive, are
quite complicated.    It is, therefore, not improbable that
many cases of conflicting claims under such leases may
arise, involving important property rights.    Of such char-
acter is probably the case at bar.    No doubt, while the
facts are of comparatively recent occurrence, all such con-
flicting claims may be settled upon terms of justice and
equity, but which might be impossible after the lapse of
considerable time; and to such purpose I regard the rem-
edy by petition in the nature of a bill *quia timet,* as quite
appropriate."

See, also, *Smith v. Wingard,* 3 Wash. T. 291 (13 Pac.
717); *Holland v. Challen,* 110 U. S. 15 (3 Sup. Ct. 495);
*Reynolds v. Crawfordsville Bank,* 112 U. S. 405 (5 Sup.
Ct. 213); *Watson v. Glover,* 21 Wash. 677 (59 Pac. 516).

The complaint in this case states a cause of action.

3.    By article six of the treaty above set out it is pro-
vided that the president may, at his discretion, cause the
lands reserved to be surveyed, and assigned to such fam-
ily or families as are willing to avail of the priv-
ilege, and locate on the same as a permanent home; and

he may prescribe such rules and regulations as will insure to the family in case of the death of the head thereof the possession and enjoyment of such permanent home and the improvements thereon. The patent in this case was issued to George Bird as the head of a family consisting of himself and Mary Bird, and to *his* heirs. It is argued by respondents that, since the treaty authorizes the president to issue a patent to such family, when patent issued to the head of the family, Mary Bird, his wife, took an equal interest with George Bird. It will be observed that, while patent issued, no title which could be alienated, except by a lease for two years, vested in the patentee. The patent gave the patentee the right of possession while the family occupied and tilled a portion of the lands, but under the patent and the treaty there was no power to sell. *Eells v. Ross,* 64 Fed. 417. Provision is also made that, when the family neglect to occupy and till a portion of the land, the president may cancel such assignment, and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe. So that it is clear that the grantees under the patent obtained only the possession and right of occupancy of the lands described. There was simply a defeasible title conveyed, and that is the condition of the estate at the present time. When Mary Bird died, no greater estate was created thereby, and the only remaining member of the family might at any time forfeit all right to possession by failure to occupy and till a portion of the lands, or by roving from place to place. Admitting, therefore, that Mary Bird took an equal interest with George Bird at the date of the patent, she took only the right to occupy and till the premises while the family lived upon them. In any event, at her death she left no greater interest than the

right of her heirs to occupy and till the premises. These heirs, not being members of the family, took no other interest in the estate. The section above quoted also provides that the president may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent homes and improvements thereon. The possessory title being in the head of the family, no provision was necessary in case of the death of other members of the family. But, in case the head of the family should die, then, under the above provision, some rule may be prescribed which would insure the possession and enjoyment of such permanent home and the improvements thereon to the family. Can it be said that upon the death of a member of the family the head lost his right of possession to the interest of the deceased? If so, then upon the death of Mary one-half of the land reverted to the United States, or descended to her heirs, who were not members of the family, and who could share her interest to the exclusion of the surviving head. We think no such construction was intended. It is more reasonable to suppose that the right of possession to the whole was to continue until such time as the state and congress, acting agreeably, should convey an absolute indefeasible estate to the survivors in interest by removing the restrictions, and that during the time the government reserved the fee absolute in itself, while the family were entitled to till and occupy the premises as a permanent home, the death of either member thereof would not change the right of occupancy, or the right to enjoy the improvements thereon, but that the remaining members of the family would continue to hold and enjoy the uses and privileges for which the land was assigned by the government, viz., for the benefit of the family.

We conclude, therefore, that upon the death of Mary Bird, George Bird was entitled to the right of possession and occupancy of the premises as long as he chose to occupy them as a permanent home, and that his right of occupancy and possession could not be disturbed by the heirs of Mary Bird, after her death. Under this view, and upon this construction of the treaty hereinabove referred to, Mary Bird at the time of her death, had no interest in the land in question which could descend to her heirs by a former husband. We might content ourselves with this construction of the treaty, and say nothing more upon this question, but, in our opinion, the question may be answered in the same way for other reasons. In the case of *Summers v. Spybuck,* 1 Kan. 370, the supreme court of Kansas had under consideration a case similar to the one at bar under a very similar treaty between the United States and the tribe of Wyandotte Indians. In stating the question then to be decided the court say:

"The only question raised by the argument is, whether the competent head of a family, under that treaty, can take the title in fee simple absolute to the land allotted, assigned and patented to him according to the terms of the patent, or whether his wife and minor children, constituting his family at the time the treaty was ratified, by force of the treaty take the beneficial interest in aliquot portions, and the head of the family holds it in trust for them. The patent, conveying the land in fee simple absolute, excludes the idea of a trust, and therefore, if such trust exists, it must result from the language of the treaty, and the failure of the officers of the United States to conform to it in making the conveyance. The patent pursues the language of the treaty as to the estate granted, and the sole question remains: Was the conveyance of the land for the family in conformity with the treaty?"

After considering the treaty, the court come to this conclusion:

"The true construction of the treaty, we think, is that lands are taken, assigned and patented to the heads of families *for or on account of* the other members of the family.' Such use of the word 'for' is legitimate; and, considering the practice of the government, established by law in the year 1847 and continued ever since, of making all Indian payments for the whole family to its head, it is probable that both parties to the treaty so used and understood it. Such construction renders the whole treaty harmonious, and consistent with the action of the officers of the government in conveying all the land for the family to John Pipe, its head."

This case is cited and followed by United States Circuit Court Judge DILLON, in *Hicks v. Butrick,* 12 Fed. Cas. No. 6458, in an action arising under the same treaty. In these cases the patentees took an indefeasible estate, and could, therefore, alienate the same. Under these authorities, even although an absolute indefeasible estate had vested in the patentee in this case, upon the death of Mary Bird the property descended to George Bird and his heirs. The case at bar is different from those cases, however, in this: that George Bird and Mary Bird took nothing except the right of possession and occupancy.

We are, therefore, of the opinion that the state courts have jurisdiction, that the complaint stated a cause of action, and that the answer of the defendant constituted no defense thereto. The cause is reversed, with instructions to the lower court to vacate the order of dismissal, and sustain the demurrer of plaintiff to the answer, in accordance with this opinion.

REAVIS, C. J., and DUNBAR, FULLERTON and ANDERS, JJ., concur.